AMERICAN KEY CORPORATION and Ron DeWeese, Plaintiffs,

v.

CUMBERLAND ASSOCIATES, Carter & Associates, Cole National Corp., and Sears, Roebuck & Company, Defendants.

Civ. A. No. C80–776A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 30, 1983.

John C. Butters, Atlanta, Ga., for plaintiffs.

Charles H. Ivy, William L. Bost, Jr., R. Peter Catlin, III, Scoggins, Ivy, Goodman, Weiss & Bost, Mark J. Levick, C. David Vaughan, Vaughan, Phears & Murphy, Emmet J. Bondurant, II, M. Jerome Elmore, Trotter, Bondurant, Miller & Hishon, Atlanta, Ga., Richard W. Pogue, Paul Michael Pohl, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Michael A. Doyle, Leah J. Sears-Collins, Atlanta, Ga., John E. Lehrer, Sears, Roebuck & Co., Chicago, Ill., for defendants.

## ORDER

FORRESTER, District Judge.

This action is before the court on motions for summary judgment by each of the defendants. It is also before the court on defendants' motions to strike certain affidavits and supplemental briefs filed by plaintiff on July 28 and 29, 1983.

### I. PROCEDURAL HISTORY.

Plaintiffs originally filed their complaint on May 6, 1980. As amended almost a year later, the complaint asserts two counts of alleged violations of 15 USC §§ 1 and 2.[1] Plaintiffs seek treble damages un-

---

1. Section 1 provides in pertinent part:

   Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal ....

   Section 2 provides:

   Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $50,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

der Section 4 of the Clayton Act, 15 U.S.C. § 15,[2] and an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26.[3] In Count I plaintiff American Key alleges that defendants refused to lease it space at two shopping malls in the Atlanta area and that this refusal to lease was pursuant to "an unlawful contract, combination and conspiracy among defendants and other unnamed co-conspirators with the intent and purpose of excluding plaintiff from those markets in an unlawful restraint of trade in violation of Section 1 of the Sherman Act." Count I also asserts that the refusal to lease to American Key was done pursuant to an unlawful conspiracy among the defendant and other unnamed co-conspirators "for the purpose and intent of conspiring to monopolize, monopolizing, and attempting to monopolize" in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In Count II of the complaint plaintiffs allege that defendants Cole and Sears have an exclusive dealing arrangement which constitutes a "contract, combination, and conspiracy in restraint of trade to exclude plaintiffs" from the relevant markets in violation of Section 1 of the Sherman Act. Count II further alleges that defendants Cole and Sears, "in furtherance of their unlawful attempt to monopolize ... and in furtherance of their ... conspiracy in restraint of trade" have "acted in concert, combination, and conspiracy with defendants Cumberland Associates and/or defendant Carter & Associates to exclude plaintiff" from two shopping malls in the Atlanta area. Plaintiffs seek over $100 million in damages for these alleged violations of Sections 1 and 2 of the Sherman Act.

After more than eighteen months of discovery defendants Cumberland and Carter filed motions for summary judgment on September 28, 1982. On December 6, 1982 this court entered a consent order allowing defendants Cole National and Sears until January 10, 1983 to file their motions for summary judgment. Plaintiffs were given until March 14, 1983 to respond to all of the motions for summary judgment, and defendants were given until April 14, 1983 to file any reply briefs. At the end of the order this court wrote that there would be no further extensions. The parties complied with this schedule and all the motions, briefs and reply briefs were filed by April 14, 1983. On June 16 this court granted defendant's request for oral argument on the motions and set the case for oral argument on September 8. On July 28 and 29 plaintiff filed a supplemental brief and a third supplemental brief with accompanying affidavits in opposition to the motions for summary judgment. These briefs and affidavits sparked a new round in the paper war between the parties with the defendants filing various motions to strike and a motion to assess costs, and the plaintiff filing a reply brief. Finally, on September 8, 1983 this court held oral arguments on the motions for summary judgment.

## II. THE MOTIONS TO STRIKE AND THE MOTION TO ASSESS COSTS.

In their various motions to strike defendants ask this court to strike as untimely and inadmissible the briefs and affidavits filed by plaintiffs in July. However, since the materials were filed well before the holding of oral argument on the summary judgment motions and were intended to facilitate this court's decision on those motions, the affidavits will be considered to the extent that they are relevant or otherwise admissible. Each of the motions to strike is therefore DENIED. The motion to assess costs is also DENIED.

---

2. Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fees. 15 U.S.C. § 15.

3. Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by violation of the antitrust laws .... 15 U.S.C. § 26.

## III. PLAINTIFF RON DeWEESE'S STANDING.

■ Defendants have raised an issue regarding Mr. DeWeese's standing to prosecute this lawsuit. Section 4 of the Clayton Act, 15 U.S.C. § 15,[4] controls standing in treble damage antitrust cases. This section provides that a person "who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may bring an action for treble damages. Section 4 has been narrowly construed to afford standing only to those persons or entities who fall directly within the "target area" of the economy affected by the allegedly illegal activities. *See, e.g., Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir.1975); *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172 (5th Cir. 1976); *Blank v. Preventive Health Programs, Inc.*, 504 F.Supp. 416 (S.D.Ga.1980). Plaintiff Ron DeWeese has asserted standing solely in his capacity as president and major stockholder of American Key. The courts of this circuit have held that stockholders, officers and directors of corporations are not protected by the antitrust laws and lack standing to prosecute claims for damages allegedly suffered by the corporation. In *Martens v. Barrett*, 245 F.2d 844, 846 (5th Cir.1957), the court held that:

> Where the business or property allegedly interfered with by forbidden practices is that being done and carried on by a corporation, it is that corporation alone, and not its stockholders (few or many), officers, directors, creditors or licensors, who has a right of recovery, even though in an economic sense real harm may well be sustained as the impact of such wrongful acts bring about reduced earnings, lower salaries, bonuses, injury to general business reputation, or diminution in the value of ownership. *Id.* at 846.

*See also Mendenhall v. Fleming Co.*, 504 F.2d 879 (5th Cir.1974). This rule is consistent with a long line of cases holding that shareholders do not have standing under the antitrust laws for injuries to the corporations in which they own stock. *See,*

*e.g., Pritchford v. Pepi, Inc.*, 531 F.2d 92, 96–97 (3d Cir.1975) (99% shareholder denied standing), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 242 (1979); *Mendenhall v. Fleming Co., supra*, at 881; *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732–34 (3d Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Peter v. Western Newspaper Union*, 200 F.2d 867, 872 (5th Cir.1953).

■ Similarly, officers or directors of a corporation do not have standing under Section 4 of the Clayton Act to assert the claims of the corporation. *See, e.g., Program Engineering, Inc. v. Triangle Publications*, 634 F.2d 1188, 1191 (9th Cir.1980) (president and founder of corporation lacks standing under antitrust laws); *Pritchford, supra*, 531 F.2d at 96–97 (president of corporation lacks standing). Since plaintiff Ron DeWeese asserts standing solely in his capacity as president and principal shareholder of American Key Corporation, he lacks standing under the antitrust laws to prosecute this action and is hereby DISMISSED. The sole remaining plaintiff is American Key.

## IV. THE MOTIONS FOR SUMMARY JUDGMENT: FACTS.

In support of the motions for summary judgment each of the defendants submitted as required by Local Rule 91.72, a statement of undisputed material facts with annotations to the record. Defendants also submitted numerous affidavits and exhibits. In response plaintiff American Key submitted what it entitled a "Statement of Material Facts as to which Plaintiffs Contend There Exists Genuine Issues to be Tried." For the most part these "facts" do not controvert the facts relied upon by defendants but rather are merely a restatement of the allegations of the complaint. Where the party opposed to a motion for summary judgment does not controvert the facts which the movant has claimed are undisputed, those facts are deemed admitted. Local Rule 91.72. Further, Rule 56(e)

---

4. *See Note 2, supra.*

of the Federal Rules of Civil Procedure provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Having given that preliminary explanation about the treatment given the facts presented by the parties, the court can now present those facts. As is usually the case with antitrust suits, the facts are voluminous.

Defendant Cumberland Associates (Cumberland) is the owner of Cumberland Mall outside of Atlanta, Georgia. Cumberland owns no other retail malls and performs no functions except in connection with its ownership of Cumberland Mall and Cumberland Office Park. Defendant Carter & Associates, Inc. (Carter), is the leasing agent of Cumberland Mall and Southlake Mall in Atlanta. Carter was also the leasing agent of Northlake Mall, also in Atlanta.

Defendant Cole National (Cole) is an Ohio corporation involved in the sale of specialty retail goods ranging from prescription eyewear to cookies to video games and home computers. Cole also provides key duplicating services on the premises of major retailers. Although key duplicating was Cole's initial business enterprise, in 1981 it accounted for less than six percent of Cole's sales.

Defendant Sears, Roebuck and Company (Sears) is a well-known retailer of a broad line of merchandise including household goods, clothing, sporting goods, house and yard products, and automotive products. During the time relevant to this lawsuit Sears did not directly offer key duplicating services or sell replacement keys. However, Sears and Cole did have a contractual arrangement whereby Cole was given the concession to offer key duplicating services within or adjacent to Sears stores. The licensing agreements [5] provide that in return for a set percentage of sales to be paid by Cole National to Sears, Cole National is granted a license to operate the key duplicating facility within or adjacent to certain Sears stores. Under the agreements, Cole is completely responsible for operating the key shops. Cole is responsible for hiring, terminating, and paying the employees who operate the facilities. Cole purchases all inventory in its own name and is responsible for determining the prices of the items and services provided. The agreements are terminable by either party on 60-days notice with or without cause. Sears expressly reserves the right to operate the shops itself, have a third party operate them, or close them altogether following termination.

Plaintiff American Key has contended that the licensing agreement between Sears and Cole is an exclusive dealing arrangement. Defendants disagree, pointing to the following facts: (1) Sears has the legal right to operate a key shop itself, have a third party operate a key shop, or discontinue the key shop operation altogether; (2) Cole has no legal obligation to operate a key duplicating facility except as to those stores covered by the agreements, and Sears has no legal obligation to permit Cole National to operate a facility at a particular store unless it agrees thereto; (3) Cole from time to time closes key shops located in Sears stores when it determines that the stores are not economically justifiable; (4) Sears has stores in which there are key duplicating facilities operated by parties other than Cole; and (5) Cole operates key duplicating facilities in stores other than those owned by Sears. Whether the licensing agreements are exclusive dealing arrangements or not is a question of law, not fact, and is for the court, not

**5.** There were actually two license agreements signed on June 1, 1977. The first agreement provides for the operation of key shops at locations outside of the main Sears store (e.g., in the parking lot). The second license agreement provides for the operation by Cole National of key shops within certain Sears stores.

the jury, to decide. For purposes of the present motions the court will consider the licensing agreements as an exclusive dealing arrangement.

In addition to its key shops, Cole National operates a chain of stores known as "Things Remembered" stores. The Things Remembered stores sell a variety of products which can be engraved or personalized, such as mugs, door knockers, cigarette lighters, and inexpensive jewelry. Some of these Things Remembered stores also offer key duplicating facilities. Defendant Cole has asserted in its statement of undisputed facts and in the affidavit of Boake Sells, President of Cole, that "most, if not all, of the 'Things Remembered' stores in the Atlanta, Georgia area do not have key duplicating services," and plaintiff has not controverted this. The Things Remembered division of Cole is separate from the key shop division.

In 1973 officials at Sears expressed to Mr. Boake A. Sells their concern that the operation of a Things Remembered store might undercut the sales of a Cole-operated key shop in a Sears store in the same shopping mall and therefore reduce the revenues Sears would receive from the licensing agreements. In response to this concern, Mr. Sells, acting on behalf of Cole, signed a letter agreement with Sears covering certain key shops operated by Cole National. This agreement (hereafter referred to as the "rebate agreement") provided that if Cole National operated a Things Remembered store in a mall in which a Cole-operated keyshop in the Sears store already existed, Cole would pay the greater of either the usual commission as calculated under the license agreements or a flat amount equal to the total commissions paid in the previous year. The agreement also provided that Cole would match the growth rate of the host Sears store by paying an additional commission if the growth rate of the Cole-operated keyshop did not match the growth rate of the host Sears store. The agreement also provided that where Cole operated a Things Remembered store in a mall in which a Sears store with a net retail volume of $8,000,000 or more per year did not have a key shop, that

Cole would open a keyshop in the Sears store at a certain minimum rent plus additional compensation based upon the growth rate of the Sears store. The agreement was clearly designed to protect Sears' revenues under the licensing agreements. The agreement does not provide that the prices charged by Cole in the Things Remembered stores would be the same as the prices charged in the keyshops located in the Sears stores. Defendant Cole has asserted, and plaintiff has not controverted, that the agreement has resulted in only minor payments to Sears, none of which related to the Atlanta, Georgia area.

The purpose of the rebate agreement is explained in an internal memorandum to Sears employees dated July 10, 1973. In pertinent part this memo provides as follows:

The intent of this Agreement is twofold. First, it provides positive assurance that the income productivity of Sears Key Shops will not be adversely affected by the opening or continued existence of Cole-operated units in the adjoining malls. Second, it assures us that the existence of a Cole-operated unit in a Sears anchored mall will not preclude the opening of an in-store Sears Key Shop, provided sufficient selling space is allocated in a location that offers reasonable prospect for a successful operation. In either case, Cole has additionally agreed that Sears Key Shops covered under this new Agreement may not be closed unless Sears so requests.

As you know, it has been suggested on occasion that Sears ought to somehow prevent Cole National from operating independent shops in Sears anchored malls. Of course, such action on our part would not be legally possible. Neither would it be desirable from a practical standpoint. The plain fact of the matter is that if an independent mall unit is not operated by Cole, it will surely be operated by another party, and this would apply to all situations where mall kiosks are permitted or encouraged by mall developers. It seems logical enough to assume that the sales level of an in-store Sears Key

Shop would be severely diluted as a result of the introduction of a Cole-operated "CAN DO" or "THINGS REMEMBERED" shop in the adjoining mall. However natural this supposition may be, it is not supported by the facts. Sears Key Shops carry a much broader assortment of key blanks than Cole's independent mall units, and will offer the same personalizing services (engraving and rubber stamps), all priced equal to or lower than comparable mall unit offerings. Consider, too, that Cole's mall units, unlike Sears Key Shops, merchandise a variety of gift and novel items which contribute a very substantial portion of their volume. Thus, the two types of operation are distinctly different in merchandising concept, and there is really no basis in fact for anticipating that one will produce an adverse effect upon the other.

Plaintiff Ron DeWeese was hired by Cole National in April of 1974 to oversee the operations of several Cole National keyshops located in the Southeastern United States. Prior to his employment with Cole National, Mr. DeWeese had no experience with key duplicating services. In 1976 Mr. DeWeese's supervisors at Cole National discovered that Mr. DeWeese had an interest, obtained without the knowledge or permission of Cole National, in a competing key shop in Atlanta. After talking with his supervisors DeWeese divested himself of this interest. However, he subsequently began another key operation on Peachtree Street in Atlanta. On June 1, 1976 DeWeese was discharged from his employment with Cole National. In August 1976 Mr. DeWeese formed American Key Corporation as a Georgia corporation to operate the Peachtree Street keyshop facility. American Key's initial capital contribution was $500 which Mr. DeWeese paid into the company in return for stock. Mr. DeWeese presently owns 55% of the stock in American Key Corporation. The remainder is owned by his wife. On June 22, 1981 American Key filed for bankruptcy claiming unsecured and secured debts of $1.16 million (of which $1 million consisted of alleged unpaid salary owed to Mr. and Mrs.

DeWeese) and total assets of approximately $65,000.

During its approximately five-year corporate existence, American Key attempted to expand rapidly throughout the Southeast. American Key operated key shops in department stores and shopping malls. It preferred to operate free-standing "kiosks" in high-traffic areas of large shopping malls and sent out hundreds of letters to shopping malls throughout the Southeast seeking such locations. However, despite all of the inquiries, American Key was only able to obtain sixteen locations during its brief history. American Key claims that it was excluded from shopping malls or relegated to unfavorable locations solely because of the monopoly power of Cole and Sears and a conspiracy on the part of Cole, Sears, and others to exclude him. Before addressing these allegations, it is instructive to examine the history of the keyshops American Key was able to open.

American Key operated three keyshops in Zayre's Department Stores in the Atlanta metropolitan area. All three were closed by April of 1977 because they failed to make a "sufficient" profit. None of these stores were in shopping malls, and there is no evidence that Sears or Cole was in any way responsible for the financial difficulties American Key encountered at those locations. American Key also operated a store at 150 Peachtree Street in Atlanta, but this store closed by December 1976. Again, there is no evidence that Sears or Cole were in any way responsible for the failure of this store to succeed. American Key opened a keyshop in Elmore's Department Store in Perimeter Mall in November of 1976. This store closed in January of 1977 because it also failed to show a sufficient profit. Neither Sears nor Cole operated a store at Perimeter Mall during this period. In November of 1977 American Key obtained another location at Perimeter Mall underneath an escalator. American Key operated this store until 1982 when the location was closed because of a dispute with the landlord regarding rent and the location. Again, neither Sears nor Cole operated a store at Perimeter Mall during

this period. In fact, Cole applied for a location at Perimeter, but was rejected by the landlord because American Key was at that time sufficiently meeting the mall's needs for that kind of service.

From May 1977 until June 1977 American Key operated a keyshop in the Clearwater Mall in Clearwater, Florida. American Key vacated the premises as a result of a dispute with the landlord regarding the items it would be permitted to sell. Neither Sears nor Cole operated a store at this mall.

In July 1978 American Key opened a location at the Sarasota Mall in Sarasota, Florida. The location was closed in February 1979 because it was not sufficiently profitable. DeWeese had demanded from the mall owners a rent reduction not provided for in the lease. When the mall owners rejected the reduction, American Key vacated the premises still owing approximately half of the rent which it had become obligated to pay. Neither Sears nor Cole operated a store in this mall.

In August 1978 American Key opened a keyshop in the Valley Hills Mall in Hickory, North Carolina. The American Key shop was located in the center of the mall in a kiosk. Sears operated a store at the Valley Hills Mall, and the store contained a keyshop run by Cole National. Cole had also attempted to rent space at Valley Hills for a Things Remembered store, but the space it desired had been unavailable. The American Key operation at Valley Hills Mall was initially profitable but became unprofitable when a local psychic predicted that the mall was going to collapse and pedestrian traffic decreased. The mall operators agreed to reduce American Key's rent from $700 per month to approximately $200 per month. American Key finally vacated the premises in January 1980 because the location was no longer profitable even with the rent reduction. At the time it left the mall American Key owed back rent to the mall owners.

In August 1979 American Key opened a location inside a SupeRx store located in Greenbrier Mall in the metropolitan Atlanta area. Neither Sears nor Cole operated a store at Greenbrier Mall during this period, although there appears to have been another keyshop operated by a third party. American Key closed this location in December 1979, leaving approximately two months rent unpaid, because the facility was unprofitable.

In September of 1980 American Key opened a kiosk location in the Shannon Mall in Union City, Georgia. This kiosk was located approximately 150 feet from a Sears store containing a Cole-operated keyshop. American Key became embroiled in two disputes with the mall owners. First, American Key claimed a rent reduction of $10,000 based upon events that had occurred at the Valley Hills Mall which was owned by the same entity. Second, the mall owners apparently requested that American Key cease selling leather goods because a nearby leather goods store had objected. The location was finally closed in May 1981 because it was unprofitable. During the approximately seven months in which it was located in Shannon Mall, American Key paid only about two months rent.

In February of 1981 American Key opened a location in the Georgia Square Mall in Athens, Georgia. Although Sears had a store at Georgia Square, that store did not have a Cole-operated keyshop. By June of 1981 American Key had paid only one month's rent, and the mall owners had American Key evicted for non-payment of rent.

In March of 1980, American Key opened a facility at South DeKalb Mall in metropolitan Atlanta, taking over a location previously occupied by a Cole National key duplicating shop. This was an "in-line" location as opposed to a "kiosk" location. American Key had wanted a kiosk location, but the mall owners were unprepared to lease the desired space to American Key on a long-term basis. Neither Sears nor Cole National operated a store at South DeKalb Mall during the one year American Key operated there. Cole had previously operated a Things Remembered store at South DeKalb Mall but had closed that store be-

cause of unsatisfactory sales. The American Key shop closed in March of 1981.

The final two locations operated by American Key, at Northlake Mall and at Cumberland Mall, and a location which plaintiff sought but was unable to obtain at Southlake Mall, appear to be the only locations involving defendants Carter and Cumberland. Defendant Carter and Associates was the leasing agent for Northlake Mall in 1976. In October 1976 Carter granted American Key a three-year lease on a kiosk location in the middle of the upper level of Northlake Mall near an escalator. The lease provided for a percentage rental. At one end of the mall Sears operated a store containing a Cole-operated keyshop on the lower level.

Sometime in late 1976 Carter sold its interest in Northlake Mall and ceased its management and leasing activities there. American Key operated the kiosk location for the three-year period of the lease and appears to have made a profit, though several of its rent payments were late. At the expiration of the three-year lease, American Key signed a one-year lease providing for higher rental payments. Some of the payments during the one-year lease term were late, and the mall's new leasing agents notified American Key that a new lease would not be granted and that American Key should vacate the premises for non-payment of rent. An eviction proceeding was instituted in DeKalb County State Court.

After opening the facility at Northlake Mall, Mr. DeWeese approached Carter & Associates to inquire about the possibility of leasing space in Cumberland Mall and Southlake Mall, which were also operated by Carter. Carter refused to grant American Key a kiosk location at either mall.

Plaintiff has alleged that the refusal to give American Key the kiosk space of its choice was part of a conspiracy among Carter, Cumberland, Cole, and Sears, as well as others, to exclude American Key.[6] Carter asserts that it had made a "unilateral management decision not to pursue leases to permanent kiosks selling goods in the common areas of either Southlake Mall or Cumberland Mall due to merchandising and design considerations." Statement of Undisputed Material Facts submitted by Cumberland Associates and Carter & Associates, ¶ 12; Second Deposition of John Turman, ¶¶ 30, 47. Plaintiff has not offered any evidence to controvert this stated rationale or to show that it was in any way a pretext for excluding American Key. Although there appears to be a Sears at Southlake Mall, it is not clear from the record whether or not that Sears contains a Cole-operated keyshop.

While American Key was not able to obtain a kiosk location at either Southlake or Cumberland Malls, Carter offered American Key the opportunity to lease "in-line" space at both malls. When DeWeese rejected the offer of an in-line space, Carter suggested the possibility that American Key could have space in an experimental section of Cumberland Mall. This experimental section, known as "Paces Crossing," was created out of an area originally intended for larger in-line stores and was not in a common area or corridor. Because the Paces Crossing section was in-line, kiosks and other booths could be set up without obstructing customer flow. American Key was given a one-year lease for a kiosk location in the Paces Crossing area of Cumberland Mall for the year commencing April 1, 1977. The lease was renewed in 1978 and again in 1979. During 1979

---

**6.** Plaintiff attaches much significance to a letter written to him by John Turman of Carter & Associates. In its entirety the letter reads as follows:

Dear Ron:

Thank you for your letter of April 25th expressing interest in the information booth at Southlake Mall. I have had an opportunity to discuss this with the Carter & Associates group to get their reaction. Even if we want-

ed to pursue the concept, Southlake has made certain agreements with the department stores relative to the locations of kiosks within the mall. The information booth is not an approved kiosk location. Additionally, you are aware that our group has been very slow to move on kiosks. Let's look for another way of your being included in the merchandise mix at Southlake.

Sincerely,

American Key experienced financial difficulties, and Mr. DeWeese asked Carter's agent, John Turman, for a rent reduction for the Paces Crossing space. Carter and Cumberland agreed to a $250 per month reduction in the base rent for the Paces Crossing space. However, on four separate occasions during the latter half of 1979 and early part of 1980 American Key's rent checks were returned for insufficient funds. Carter and Cumberland decided not to renew American Key's lease at the end of the term. A new tenant willing and able to pay $500 more per month in base rent than American Key was paying at the time, in addition to the usual percentage rental, was obtained to take American Key's place. As an accommodation to American Key, Carter and Cumberland agreed to allow it to remain in Cumberland Mall for 30 days beyond its lawful term. A special 30-day lease was drawn up and given to Mr. DeWeese for his signature on behalf of American Key. However, the document Mr. DeWeese returned to Carter was a different document than the one he had been given. The document returned by Mr. DeWeese was identical in all respects to the one he had been given except that the term of the lease had been changed from 30 days to 30 years. Carter detected the alteration and, believing that it was a deliberate act of deception, demanded that American Key leave immediately. American Key refused to do so, and on April 28, 1980 Carter filed a dispossessory action against American Key in the Cobb County State Court. American Key filed the present antitrust suit on May 6, 1980.

In sum, the facts show that American Key was not excluded from malls operated by Carter and/or Cumberland. At Northlake Mall American Key was given a kiosk location that was profitable at least as long as Carter had an interest in the mall. At Southlake Mall, Carter refused to grant plaintiff a kiosk location in a corridor but did offer American Key in-line space which American Key refused. American Key was also denied a corridor location for a kiosk at Cumberland Mall but was instead first offered in-line space and then a kiosk

space in the Paces Crossing section. The facts show therefore that Carter and Cumberland at least initially regarded American Key as a desirable tenant and made efforts to accommodate American Key.

## V.  CONCLUSIONS OF LAW.

■  Summary judgment under Rule 56 is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Plaintiff has vigorously argued that antitrust cases, because they are often very complex and rely on inferences of motive and intent, are poorly suited for disposition by summary judgment. In many cases this is true. However, where plaintiff has offered no facts showing that triable issues exist, summary judgment is appropriate. As the Supreme Court stated in *First National Bank v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968):

> To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

The Eleventh and Fifth Circuits have, in recent years, affirmed grants of summary judgment for defendants in antitrust cases where the plaintiffs have failed to produce significant probative evidence supporting

their allegations. For example, in *In Re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 440 (5th Cir.1982), the Fifth Circuit stated:

The mere allegations of a contract, combination, or a conspiracy, for the purpose of restraining trade or commerce, and resulting damages, once rebutted, will not withstand summary judgment. (Citation omitted). It is now established that "simply because a suit is brought under the antitrust laws does not foreclose a summary judgment." (Citations omitted). In short, the requirements of Rule 56 are no less applicable in antitrust actions. Indeed, a strong argument can be made, in an appropriate case, for the particular applicability of the summary procedure in antitrust litigation.

*See also Joe Regueira, Inc. v. American Distilling Co., Inc.*, 642 F.2d 826, 832 (5th Cir. Unit B 1981) (stating that the defendants' introduction of affidavits showing that they terminated a plaintiff because it failed to pay its debts, rather than as part of a conspiracy, shifted the burden to the plaintiff to produce significant probative evidence that an illegal conspiracy was the real reason for the termination); *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 553–565 (5th Cir.1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981) (summary judgment entered when plaintiff failed to produce admissible evidence of conspiratorial conduct by the defendant); *General Chemicals, Inc. v. Exxon Chemical Co., U.S.A.*, 625 F.2d 1231, 1233 (5th Cir.1980). ("To survive a motion for summary judgment, evidence must suggest reasonable inferences of conspiracy"); *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107 (5th Cir.1979); *Daniels v. All Steel Equipment, Inc.*, 590 F.2d 111 (5th Cir.1979).

▪ The above cases make it clear that where the defendants have rebutted plaintiff's allegations of conspiracy with sworn affidavits or other admissible evidence, the burden shifts to plaintiff to come forward with significant probative evidence supporting his allegations. *See, e.g., White v. The Hearst Corp.*, 669 F.2d 14, 17–19 (1st Cir.

1982). In evaluating the evidence and undisputed facts before it,

[t]he court must indulge every *reasonable* inference from those facts in favor of the party opposing the motion. Insofar as any weighing of inferences from given facts is permissible, the task of the court is not to weigh these against each other but rather to cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness, casting aside those which do not meet it and focusing solely on those which do. If a frog be found in the party punchbowl, the presence of a mischievous guest—but not the occurrence of spontaneous generation—may reasonably be inferred. *American Telephone and Telegraph Co. v. Delta Communications Corp.*, 590 F.2d 100, 101–02 (5th Cir.1979).

Granting plaintiff all reasonable inferences, the court will consider the evidence presented in this case to determine whether triable issues exist which would preclude summary judgment.

### A. The Relevant Market.

▪ In order to analyze plaintiff's antitrust claims it is first necessary to define the relevant market in which commerce is allegedly being restrained or monopolized. "Without a definition of that market there is no way to measure [a defendant's] ability to lessen or destroy competition." *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). The relevant market actually consists of two analytically different markets. First, the court must identify the products or services affected. This is known as the product market. Second, the court must define the geographic areas within which trade in the products or services occurs. This is known as the geographic market. Study of the relevant market is an inquiry into the "area of effective competition" within which the defendant or defendants operate. *Standard Oil Co. v. United States*, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949). To the

extent that the antitrust laws are designed to maximize the economic allocation of resources and the availability of goods and services at a minimum cost, the focus is not on *how* a party wishes to do business but on whether he *can* do business in providing the goods and services to the consumers. The antitrust laws do not protect a right of a party to do business in any format that he chooses but rather protects competition between suppliers of similar goods and services in a variety of formats.

■ In this case it is beyond dispute that the relevant product market is "replacement keys and related items." The problem comes in defining the relevant geographic market. Plaintiff has insisted from the outset that the relevant geographic market consists of regional shopping malls with over 500,000 square feet of leasable area and at least two major anchor tenants. The court disagrees with plaintiff's definition. Ordinarily "[t]he relevant geographic market is the area in which sellers of the particular product or service operate and to which purchasers can practicably turn for such products or services." H.M. Applebaum, et al., Antitrust Law Developments, p. 51 (ABA 1975); *see Standard Oil Co. v. United States*, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949). Plaintiff has argued that the only area of effective competition between the parties lies in shopping malls fitting its description. As support for this plaintiff has offered evidence that replacement keys are purchased by consumers primarily upon impulse rather than by planning. In other words, consumers rarely set out to purchase a replacement key but rather make such purchases on the spur of the moment when they see a keyshop. Plaintiff has argued that the only way to take advantage of such impulse purchasing is to have a keyshop in a high pedestrian traffic area of a large regional shopping mall with over 500,000 square feet of leasable area and at least two major anchor tenants. However, the record establishes that, considering the patterns of trade, re-

placement keys and related items are available to consumers not only in large regional shopping malls but also in free-standing hardware stores, variety stores and drugstores. The court would also judicially notice that such items are readily available from a large number of locksmiths. Since consumers are able to purchase replacement keys and related products from a variety of sources other than large regional shopping malls, and since suppliers offer these products through a variety of outlets other than large regional shopping malls the court can see no basis for defining the geographic market as large shopping malls. Simply because plaintiff regards such shopping malls as the best or ideal locations for selling his product *in his format* does not mean that they are the only or even the predominant "area in which the sellers of the particular product or service operate."[7]

For reasons stated hereafter it becomes unimportant in this case as to whether the market is local, regional or national.

### B. Section 1 Claims.

■ Plaintiff is entitled to relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, if it can show the existence of a contract or conspiracy which unreasonably restrains competition. *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

■ As between Sears and Cole plaintiff arguably has established that a contract or combination does in fact exist. The licensing agreement between Sears and Cole is a *de facto* exclusive dealing agreement similar to a vertical exclusive territory agreement or a franchising agreement. Such agreements are not *per se* illegal but are governed by the rule of reason. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1976). In order to prevail under the rule of reason plaintiffs must show that the exclusive dealing agreement whereby only Cole is allowed to

---

**7.** The affidavits of Ron DeWeese and Professor Henry focus solely upon regional shopping malls rather than the area of effective competition. They are therefore of little assistance in this case.

operate key concessions in Sears stores results in competitive harm. If the plaintiff is able to show that the agreement results in competitive harm, then the defendants must show either that the arrangement had redeeming virtues, *Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* or that there was no better way to obtain legitimate objectives. *See Tampa Electric Company v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) (where insuring a stable and reliable supply of fuel for production of electricity justified an exclusive dealing agreement). The focus of such an analysis is the effect of defendants' conduct upon competition, not upon the individual competitor. *Brown Shoe Company v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). A simple refusal to deal with a particular buyer, without some showing of an unreasonable restraint of trade, does not violate Section 1. In *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir.1963), the court held that:

> A manufacturer has a right to select its customers and refuse to sell its goods to anyone, for reasons sufficient to itself. *United States v. Colgate & Co.,* 250 U.S. 300 [39 S.Ct. 465, 63 L.Ed. 992].... A refusal to deal becomes illegal under the Act only when it produces an unreasonable restraint of trade, such as price fixing, elimination of competition or the creation of a monopoly. *United States v. Parke, Davis & Co.,* 362 U.S. 29 [80 S.Ct. 503, 4 L.Ed.2d 505] .... The fact that a refusal to deal with a particular buyer, without more, may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act.
>
> . . . .
>
> Unless it can be said that the refusal to deal with the plaintiff had the result of suppressing competition and thus constituted "restraint of trade" within the meaning of Section 1 of the Sherman Act, there is no violation of the Act. 318 F.2d 283 at 286–87 (some citations omitted).

*Ace Beer Distributors* has been extensively cited and followed in every circuit, including this one. *See, e.g., Burdett Sound, Inc. v. Altech Corp.,* 515 F.2d 1245, 1248 (5th Cir.1975).

■ Arguably, by the decision to exclude a second keyshop from its own premises Sears has limited competition within its own stores by not providing customers alternative sources for replacement keys. However, Sears has shown that providing for dual concessionaires of the same product would require additional space and increased expenses for no increased benefit to itself. Therefore, in this situation it would be unreasonable to require Sears to subsidize competition within its own stores. Insofar as plaintiff challenges the exclusive dealing arrangement on the ground that it has been denied the opportunity to operate key concessions within Sears stores, defendant Sears is entitled to summary judgment, for plaintiff has adduced no evidence of harm to competition in the providing of replacement keys and related items. Further, of course, the geographic market is not established but it is clearly much larger than either a Sears store or a regional mall. The existence of the rebate agreement adds nothing of value to the case for plaintiff. It is a restriction on how Cole does business, but it does not harm plaintiff's business. 15 U.S.C. § 15.

Plaintiff's Section 1 theory of the case goes beyond the agreement between Sears and Cole. Plaintiff observes that Sears is a major anchor tenant in regional malls, that Sears has considerable bargaining leverage with mall operators, and concludes that the leverage is in fact used to exclude competitors in the key business from such malls, and that such a conspiracy did exist with Carter and Cumberland. If true, such a scheme would be a *per se* violation of the Sherman Act. *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). These allegations are wanting in support by the proof.

The evidence shows that plaintiff was able to set up its kiosks in shopping malls containing both a Sears with a Cole-operat-

ed keyshop and a Things Remembered store. The record also shows that Cole was denied space for a Things Remembered store in at least one shopping mall containing an American Key kiosk despite the fact that a Sears was already present. The evidence also shows that American Key could have entered more malls than it did if it had wanted to do business in a format other than the kiosk format. Plaintiff has failed to show that the licensing agreement and/or the rebate agreement had any effect on the ability of either American Key or any other competitor to compete in the relevant market. After more than three years of discovery plaintiff offers only three letters and one memorandum to support its contention that all of the defendants were part of an illegal contract or combination in restraint of trade. The first letter, dated September 23, 1971, is from Mr. Daniel B. Rather of Carter & Associates to Mr. Donald Burger of Cole National.[8] In this letter Carter & Associates explains that space for kiosks at Northlake and Cumberland Malls would not be leased until after the malls had opened. From this plaintiff would draw the inference that "Cole, Carter, Cumberland, and Sears were involved in joint efforts to 'design' competing keyshop space out of the mall." Plaintiff's Brief in Opposition to Defendants' Motions for Summary Judgment at 41. To make such an inference from this document strains credulity. At best this document indicates only that Cole National had inquired about the possibility of leasing kiosk space and had been told that such spaces would not be leased until after the opening of the mall. Any inference of a conspiracy to design competing keyshops out of the mall is simply not reasonable. The fact that this letter was written five years prior to American Key's incorporation and the fact that American Key was given in 1977 a lease for a profitable kiosk at Northlake further weakens any possible inference of a conspiracy to

design American Key out of competition with Sears.

The second letter relied upon by plaintiff in support of its claim against Carter and Cumberland is a 1974 letter from R.W. Brown of Carter to Dan Caufield of Cole. In this letter, also written two years prior to American Key's incorporation, Carter informs Cole that a couple of requested spaces at Cumberland and Northlake Malls could not be leased to Cole. In this letter Carter informs Cole that

[t]he space at Cumberland, G–2, is in conflict with the operation at Sears and the space that we had considered at Northlake will probably be leased as is instead of breaking it into two stores as we had previously discussed. As soon as a space is available that would suit your needs in either center we will be in touch with you.

Plaintiff asserts that this letter is "an admission by a defendant that leasing agents (and mall developers) are not going to place a competing keyshop, such as American Key, in a high traffic area where it would be 'in conflict with the operation at Sears'." Plaintiffs' Purposed Discovery Plan [sic] at 7–8. However, a letter from Carter denying space to Cole because it would conflict with Sears is hardly "significant probative evidence" of a conspiracy between Carter, Cole and Sears. To the contrary, it proves that the alleged co-conspirator was acting against the conspiracy.

Plaintiff's third letter, dated May 3, 1977, is from John Turman of Carter & Associates to Ron DeWeese of American Key. In this letter defendant Carter refers to certain agreements with department stores at Southlake Mall regarding the location of kiosks within the mall.[9] Regarding this letter and the 1974 letter quoted above, plaintiff asserts: "Clearly, the inference could be drawn from these circumstances that Carter communicated with Sears about limiting American Key to a poor locaion

---

**8.** In its entirety this letter reads as follows:
Dear Donald:
Northlake opens October 6. Shortly thereafter we will begin the kiosk discussions and will be in touch with you. We will follow the

same policy at Cumberland and not lease kiosks until after the opening.
Yours Sincerely,

**9.** See Note 6, *supra.*

[sic] at Cumberland Mall." However, Turman offers to look for other ways in which American Key can be in the mall. As there is nothing which supports a belief that the location would be a poor one, the letter is no evidence of an attempt to exclude plaintiff altogether.

Plaintiff's final piece of evidence offered against Carter and Cumberland is the internal memorandum of Sears explaining the rebate agreement with Cole to certain Sears employees.[10] Plaintiff regards this memorandum as evidence that Sears and Cole, through the rebate agreement, were attempting to exclude competition from shopping malls in violation of Section 1 of the Sherman Act. Plaintiff attaches particular significance to the portion of the memo which states that "if an independent mall unit is not operated by Cole it will surely be operated by another party ...." How this memorandum dated July 10, 1973 (three years prior to American Key's incorporation) and circulated only among Sears employees, is supposed to evidence participation by Carter and Cumberland in the conspiracy is unclear. Plaintiff apparently contends, without proof, that Carter and Cumberland knew of this alleged desire on the part of Sears and Cole to exclude competition and aided them in doing so by denying plaintiff the locations it desired.

Examining the evidence presented above and giving plaintiff the benefit of all reasonable inferences, the most that can be said regarding the role of Carter and Cumberland in this alleged conspiracy is this. As leasing agent for Northlake Mall, Southlake Mall, and Cumberland Mall Carter did not consider granting leases to kiosks until after the malls had been built. Further, it can be inferred that the various department stores had contractual agreements with the mall developers regarding the product mix at the malls and certain design considerations, including the location of kiosks. Finally, it can be inferred that Carter as leasing agent would have been responsive to objections of the in-line stores regarding free-standing kiosks, which pay less rent. This, however, is all

that can be inferred from plaintiff's evidence. To rebut any inference of a conspiracy against plaintiff, defendants Carter and Cumberland have presented strong, persuasive business reasons justifying the refusal to grant the desired kiosk locations at Southlake and Cumberland Malls and justifying the eviction of American Key from Cumberland Mall.

Each of the defendants has offered sworn affidavits denying the existence of any contract, combination or conspiracy against plaintiffs. It is plaintiff's duty then to come forward with significant probative evidence supporting its allegations of a conspiracy. Giving all reasonable inferences to the plaintiff, the court cannot find that it has offered significant probative evidence which would tend to show the conspiracy it has alleged. Accordingly, all defendants are entitled to summary judgment on the Section 1 claims.

### C. The Section 2 Claims.

Section 2 of the Sherman Act[11] prohibits actual monopolization of, and conspiracies or attempts to monopolize, interstate commerce. In *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) the Supreme Court dealt with the offense of actual monopolization:

> The offense of monopoly under Section 2 of the Sherman Act has two elements: (1) The possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.... In *United States v. E.I. Du Pont De Nemours & Co.*, 351 U.S. 377, 391 [76 S.Ct. 994, 1005, 100 L.Ed. 1264], we defined monopoly power as "the power to control prices or exclude competition." The existence of such power ordinarily may be inferred from the predominant share of the market. 384 U.S. at 570–71, 86 S.Ct. at 1704.

In this case plaintiff has not shown that any of the defendants possesses monopoly power within the relevant market. The

---

**10.** See pages 1249–1250, *supra*.

**11.** See Note 1, *supra*.

relevant product market in this case consists of replacement keys and related items. Neither Carter nor Cumberland sells replacement keys, so neither is capable of monopolizing the relevant product market. The relevant geographic market is the "area in which sellers of the particular product or service operate and to which purchasers can practicably turn for such products or services." H.M. Applebaum, Antitrust Law Developments p. 51 (ABA); *Tampa Electric Company v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961); *see Standard Oil Co. v. United States*, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949). As the court has already demonstrated, the relevant geographic market in this case is far broader than any single shopping center or any class of shopping centers and is perhaps national in scope. Plaintiff has not demonstrated, or offered any evidence tending to demonstrate, that either Sears or Cole has "the power to control prices and exclude competition in the relevant market. *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Because plaintiff is unable to demonstrate the existence of monopoly power, much less demonstrate that such power was willfully acquired and maintained instead of being a consequence of "a superior product, business acumen, or historic accident," *id.*, each of the defendants is entitled to summary judgment as to plaintiff's monopolization claim.

The defendants are also entitled to summary judgment as to any claim that they attempted or conspired to monopolize the sale of replacement keys and related products. First, each of the defendants has come forward with a sworn affidavit denying the existence of any conspiracy to monopolize the replacement key industry. In the face of these sworn affidavits, plaintiff has come forward with no "significant probative evidence" to support the existence of a conspiracy. Defendants are therefore entitled to summary judgment as to any conspiracy theory. *In Re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 440 (5th Cir.1982); *White v. The Hearst Corp.*, 669 F.2d 14, 17–19 (1st Cir. 1982); *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 554 (5th Cir.1980). Additionally, in order to prevail on an attempt-or conspiracy-to-monopolize claim plaintiff must demonstrate both a specific intent to monopolize, *United States v. Aluminum Co. of America*, 148 F.2d 416 at 431–32 (2d Cir.1945), and a "dangerous probability" that the attempt would be successful in achieving monopoly power in the relevant market. *See Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905); *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946); 3 Von Kalinowski, Antitrust Laws and Trade Regulation § 7.01[1]. Plaintiff has not produced a single fact to show a *specific* intent on the part of any of the defendants to monopolize the sale of replacement keys nationwide, in the Southeast, or even in the market defined by plaintiff. Finally, plaintiff has not demonstrated, or introduced any evidence which would demonstrate, a "dangerous probability" that Sears or Cole would be successful in achieving monopoly power. The licensing agreement and the rebate agreement do not directly or by inference either fix prices or exclude competitors.[12] There is no evidence anywhere in the record that Sears or Cole has ever attempted to acquire the power to control prices or exclude competition in the relevant market, and there is absolutely no evidence in the record which would indicate a dangerous probability that the defendants could succeed in accomplishing this goal if they had it. Each of the defendants

---

12. The rebate agreement does condition the basis on which Cole may compete with Sears, but the only evidence is that this is the *quid pro quo* for the concession inside the Sears store. While this might give Cole something to complain about, there is no evidence that the rebate agreement has had any effect on American Key or other competitors. The only evidence in this case which bears upon the intent of Cole and Sears in entering the rebate agreement is the memorandum describing the agreement to Sears employees. *See* pages 1249–1250, *supra*. By its terms this memorandum clearly shows that Sears expects competition from other keyshops and disclaims any intent to limit such competition.

is therefore entitled to summary judgment on plaintiff's attempt-to and conspiracy-to-monopolize claims.

As further reason for granting the summary judgment motion, it should be noted that to set aside the exclusive dealing agreement between Sears and Cole or to require shopping center managers to allow kiosks would be violative of the basic right of businessmen to select with whom they will do business and to set the terms and conditions on which they will do business. The only limitation to these rights in our society is that they not be exercised in an anti-competitive manner. In the face of sworn denials plaintiffs have adduced no persuasive direct or circumstantial evidence that any of the business decisions by these defendants were or were intended to be anti-competitive in the sense that that word is normally used.

## VI. CONCLUSION

In sum, each of the motions to strike plaintiffs' supplemental briefs and affidavits is DENIED. The motion by Sears to assess costs under Rule 56(g) is also DENIED. Plaintiff Ron DeWeese is hereby DISMISSED as a party plaintiff. All of the motions for summary judgment are GRANTED.